# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Criminal Action Number** |
| | ) | **06-06009-01-CR-W-FJG** |
| **Phillip E. Fish,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## Report and Recommendation

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE WITH SUGGESTIONS filed September 8, 2006 (Doc. #25) by defendant Phillip E. Fish ("Fish"). On October 16, 2006, the undersigned held an evidentiary hearing on Fish's motion. Fish was present and was represented by his counsel, Robert G. Kuchar. The government was represented at the hearing by Assistant United States Attorney Kathleen D. Mahoney. At the evidentiary hearing, the government called two witnesses: Daniel Anthony Landi, Jr. and Chad Tilsworth. The lone exhibit offered into evidence was Plaintiff's Exhibit #1 (a DVD copy of Fish's interaction with and arrest by law enforcement officers). On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

### PROPOSED FINDINGS OF FACT

1.      On March 19, 2006, Daniel Landi was employed by the Missouri State Highway Patrol working on traffic control and drug interdiction in Clinton County and Caldwell County. Tr. 3-4, 21.

2.      At approximately 1:00 a.m. on that date, Patrolman Landi received a radio communication from a deputy in Daviess County. Tr. 4.

3.     The deputy informed Patrolman Landi that he was following a vehicle that the deputy thought might have been involved in some type of illegal drug activity.  According to the deputy, he had been on patrol when he had seen the suspect vehicle and another vehicle parked side by side in an old park area.  The deputy told Patrolman Landi that the vehicles dispersed and went in different directions when he made a second pass through the park.  Tr. 4, 21-22.

4.     The deputy identified the vehicle that he was following as a tan 2006 Ford Taurus, with Arizona license plates (196 HSG).  Tr. 4-5.

5.     After talking with the deputy, Patrolman Landi drove to I-35 (near mile marker 54), located the Ford Taurus, and began following the vehicle on southbound I-35.  Tr. 5.

6.     Patrolman Landi made radio contact with the Clinton County Sheriff's Department and a deputy from that office,  Chad Tilsworth, also began following the Ford Taurus to provide Patrolman Landi with any possible backup.  Tr. 6, 49-50.

7.     Eventually, the Ford Taurus exited from the interstate near mile marker 33 on I-35 (at Holt, Missouri) and pulled into a Conoco convenience store/service station.  Tr. 5-6, 22.

8.     After the Ford Taurus parked in front of the convenience store, Patrolman Landi pulled his vehicle into the parking lot and parked next to the Ford Taurus.  Tr. 6, 28.

9.     Deputy Tilsworth also pulled into the parking lot and parked his vehicle on the other side of the Ford Taurus.  Tr. 6-7, 28.

10.     The driver of the Ford Taurus (later identified as Fish) got out of his vehicle and started into the convenience store.  Tr. 7.

11.     As Fish was going into the store, Patrolman Landi approached him, shook hands with him and introduced himself.  Patrolman Landi told Fish that he was just checking on him to make sure he was okay since Fish's eyes were "a little bit red and glassy."  Tr. 7, 23-24, 26.

12.     Fish told Patrolman Landi that he was staying with a friend who lived nearby and he just getting some snack items before heading to his friend's house.  Tr. 7.

13.     Fish then proceeded to shop for items in the convenience store, while Patrolman Landi engaged in a conversation with the convenience store clerk.  Tr. 8, 32.

14.     While Fish was shopping, Patrolman Landi asked Deputy Tilsworth to look at the Ford Taurus and see if there were any indications of illegal activity in plain view.  Tr. 14, 52.

2

15.     After going out to look at the Ford Taurus, Deputy Tilsworth came into the convenience store and whispered to Patrolman Landi that he had seen two marijuana pipes in the vehicle.  Tr. 15, 34, 52-53.

16.     After Fish had paid for his items, Patrolman Landi asked Fish if he could speak to him some more and Fish consented.  Tr. 9, 33.

17.     Patrolman Landi asked Fish about bulges in his pants pockets and asked if he could see the contents.  Fish again consented and pulled some of the items (cash, keys, cell phone, rubber bands, wallet) out of his pockets and showed them to Patrolman Landi.  Tr. 11.

18.     Patrolman Landi then noted that Fish did not remove all the items from his pockets, so he asked Fish if he could see the remaining items.  Fish again consented and briefly produced a small glass vial from his pockets and then quickly put the bottle back in his pockets.  Tr. 12.

19.     Patrolman Landi then asked if he could search Fish's pockets, but Fish refused.  Tr. 12-13, 38.

20.     Patrolman Landi then asked Fish if he had any luggage and Fish said that his luggage was in the trunk of the Ford Taurus along with samples of fuel additives (which Fish sold).  Tr. 13, 39.

21.     Fish then offered to show Patrolman Landi some of the fuel additive products, suggesting that the Highway Patrol could save money in fuel costs by using some of his products.  Tr. 13.

22.     After looking at the items in the trunk, Patrolman Landi shined his flashlight into the Ford Taurus and saw "clearly" what appeared to be two marijuana pipes.  Tr. 16, 45.

23.     Patrolman Landi asked Fish about the pipes and Fish replied that they looked like marijuana pipes and a friend must have left them in his car.  Tr. 16.

24.     Patrolman Landi asked Fish if he would unlock the Ford Taurus so that the marijuana pipes could be retrieved, but Fish refused.  Tr. 16.

25.     At that time, Patrolman Landi placed Fish under arrest for possession of drug paraphernalia, handcuffed him, and advised him of his *Miranda* rights.  Tr. 16, 20.

26.     The entire encounter from Patrolman Landi's first conversation with Fish until his arrest lasted 24 minutes (from 1:28 a.m. to 1:52 a.m.).  Tr. 25, 44; Pl. Ex. #1.

3

27. Prior to placing Fish under arrest, Patrolman Landi had not raised his voice with Fish, had not unholstered his weapon, had not given Fish any orders, had not made any threats toward Fish, and had not placed his hands on Fish. Tr. 18-19, 53-54.

28. Following Fish's arrest, his person was searched, uncovering the glass vial and a glass pipe with burnt residue in Fish's pockets, a switchblade knife in his belt, and another glass pipe with burnt residue in his right sock. Tr. 17.

29. In addition, following Fish's arrest, the Ford Taurus was searched, containing additional contraband and nearly $19,000 in cash. Tr. 18, 54-56.

## CONCLUSIONS OF LAW

Fish argues that his constitutional rights were violated by Patrolman Landi questioning of him at the convenience store's, the search and seizure of the marijuana pipes from the Ford Taurus, and the search and seizure of his person and vehicle following his arrest. The Court initially concludes that when Patrolman Landi saw the marijuana pipes in plain sight[1] through the window of the Ford Taurus, he had legally sufficient grounds to place Fish under arrest. *See*, *e.g.*, *United States v. Cabrera-Reynoso*, 195 F.3d 1029, 1031 (8th Cir. 1999) (law enforcement officers may execute a warrantless arrest where the facts and circumstances would support "a

---

[1] It is axiomatic that Patrolman Landi's act of looking through Fish's car window did not violate the Fourth Amendment. As the Supreme Court has repeatedly held, "a truly cursory inspection – one that involves merely looking at what is already exposed to view, . . . – is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion." *Arizona v. Hicks*, 480 U.S. 321, 328, 107 S.Ct. 1149, 1154 (1987). As such, Patrolman Landi's conduct was not a "search" because a person who parks a car – which necessarily has transparent windows – on private property does not have a reasonable expectation of privacy in the visible interior of his car. *Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535, 1542 (1983). Patrolman Landi's actions were not unconstitutionally curious; if an item is in plain view, looking at it invades no privacy interests. *Horton v. California*, 496 U.S. 128, 133-34, 110 S.Ct. 2301, 2306 (1990) (*citing Hicks*, 480 U.S. at 325, 107 S.Ct. at 1152-53). Moreover, the fact that Patrolman Landi utilized a flashlight in looking through the automobile's window does not alter the plain view analysis. *See, e.g., United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995); *United States v. Garner*, 907 F.2d 60, 62 n.2 (8th Cir. 1990).

4

prudent person's belief that the suspect had committed or was committing a crime[2]").  Moreover, once Fish was placed under arrest, it was constitutionally proper for officers to search both Fish and his automobile incident to that arrest.  *United States v. Robinson*, 414 U.S. 218, 226, 236, 94 S.Ct. 467, 472-73 (1973) (search of an individual's person incident to a lawful arrest); *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864 (1981) (vehicle search incident to a lawful arrest).

Thus, the issue for the Court turns on whether Patrolman Landi instituted a "seizure" of Fish prior to his plain view observation of the marijuana pipes.  If no seizure occurred, then there are no constitutional impediments to the subsequent law enforcement actions.  If a seizure did take place, then law enforcement actions leading to the seizure must be permissible under the Fourth Amendment.  In this case, the Court concludes that no seizure of Fish occurred prior to Patrolman Landi's plain view observation of the marijuana pipes in the Ford Taurus.

While the entire encounter between Fish and Patrolman Landi lasted for nearly 24 minutes (although, for some of that time, Fish was shopping in the convenience store), it appears from both the testimony adduced at the hearing as well as the videotape from the patrol car that the interaction was completely consensual.  To that end, it is well-settled:

> Not all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment.  A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment.

*United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001).  The determination of when an

_____

2        MO REV. STAT. 195.233(1) makes it a crime to "possess . . . drug paraphernalia to inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or an imitation controlled substance."

5

encounter between law enforcement and a citizen rises to the level of non-consensual (and thus triggers the Fourth Amendment) is "a fact intensive one which turns upon the unique facts of each case." *Id.* Nonetheless, several matters have been considered by the courts and as summarized recently by the Eighth Circuit:

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Mere police questioning does not constitute a seizure, and so long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. It is clearly not a seizure, for example, for an officer to approach an individual in a public setting, identify himself as a police officer, and ask the individual to step aside and talk to detectives. A request to see identification is not a seizure, as long as the police do not convey a message that compliance with their request[ ] is required.. There is no *per se* requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse. That many people agree to speak with police when asked does not tend to suggest that reasonable persons do not feel free to decline: While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.

*United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006) (*citations and internal quotations omitted*).[3] Rather, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554,

---

[3] Nor is a Fourth Amendment seizure instituted merely by a law enforcement officer <u>requesting permission</u> to search a person's pockets, luggage, or automobile. *See, e.g., United Stater v. Ortiz-Monroy*, 332 F.3d 525, 528 (8th Cir. 2003); United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001); *Florida v. Bostick*, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 2386 (1991).

6

100 S.Ct. 1870, 1872-73 (1980).

In the instant case, the Court concludes that there was no seizure of Fish. To that end, the Court would note that Patrolman Landi "did not use physical force, make a show of authority, or use demanding language, but simply asked [Fish] whether [he] had unlawful items and whether [he] would consent to a search." *United States v. Coney*, 456 F.3d 850, 858 (8th Cir. 2006). Fish was free to terminate his encounter with Patrolman Landi at any time up until he was arrested. As noted by the Eighth Circuit, the fact that Fish chose not to end the discussion with Patrolman Landi does not negate the consensual nature of the interaction.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS EVIDENCE WITH SUGGESTIONS filed September 8, 2006 (Doc. #25) by defendant Phillip E. Fish ("Fish").

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ John T. Maughmer*
**John T. Maughmer**
**United States Magistrate Judge**

7